IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SEAN JENKINS, | * |
| Plaintiff, | * |
| v. | *      Civil Action No. PX-21-2364 |
| M.S. WILLIAM BEEMAN, *et al*., | * |
| Defendants. | * |
| | *** |

## MEMORANDUM OPINION

Sean Jenkins, an inmate at North Branch Correctional Institution ("NBCI"), has filed suit pursuant to 42 U.S.C. § 1983, alleging delay and denial of medical care in violation of the Eighth Amendment to the United States Constitution. Jenkins sues Richard Roderick, Acting Warden of NBCI, nurse William Beeman, and Asresahegn Getachew M.D. ECF No. 1. Jenkins also alleges that Defendants violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101. *Id*. Presently pending is Defendants' motion to dismiss the claims or alternatively for summary judgment in their favor. ECF Nos. 19, 21. The Court has reviewed the pleadings and finds no hearing is necessary. Local Rule 105.6 (D. Md. 2021). For the reasons stated below, Defendant Roderick's Motion, ECF No. 19, is GRANTED. Defendants Beeman and Getachew's Motion, ECF No. 21, is GRANTED as to Beeman and DENIED as to Getachew. The ADA claim is dismissed.

I.   **Background**

On August 15, 2020, while housed at Jessup Correctional Institution ("JCI"), Jenkins was urgently brought to the medical unit after he apparently injured himself in the prison yard. ECF No. 19-4 at 176.[1] Physician assistant, Emmanuel Esianor, examined Jenkins who reported that he

---

[1] Because Defendants have submitted near identical medical records (*compare* ECF No. 19-4 *with* ECF Nos. 21-3–

hurt his left ankle doing a summersault and that he had taken a large quantity of narcotics. *Id*. Jenkins appeared drowsy and disoriented, and his ankle was swollen. *Id*. Esianor ordered an x-ray on his ankle and that Jenkins received IV fluids and naloxone. The same day, Jenkins also saw nurse Nathalie T. Bih who administered the IV fluids and discharged him to his housing unit with directions to return in two days for an x-ray. *Id*. at 173.

Two days later, on August 17, 2020, nurse Diana Adebayo-Lewis examined Jenkins for suspected drug use after he had been found in the housing unit "jumping and yelling and 'kind of hysteric (sic).'" ECF No. 19-4 at 171. Adebayo-Lewis described Jenkins as lucid, and responsive. *Id*. The same day, Jenkins' right ankle was x-rayed, revealing an acute displaced fracture of the distal fibula with several attendant complications. *Id*. at 21. Doctor Robert P. Williams reviewed Jenkins' x-ray and consulted with another prison physician who recommended that an orthopedist examine Jenkins. *Id*. at 170. Evidently, the doctors were unable to locate the in-house orthopedist that day, and Jenkins ultimately did not see the specialist for three more weeks. *Id*. at 163, 170.

Jenkins next saw nurse Clarice Aryiku on September 2, 2020, during which she provided Jenkins an ankle brace and prescribed medication for his pain. ECF No. 19-4 at 165-167. Aryiku also requested that Jenkins see the in-house orthopedist that day. *Id*. at 168. Jenkins was next examined six days later at the facility by orthopedist, Lawrence A. Manning, MD. ECF No. 19-4 at 163. Dr. Manning ordered a second x-ray, which revealed that Jenkins had an acute fracture of the distal fibula with mild displacement and "subluxation," or dislocation, of the tibia-talus joint. *Id*. at 164. From this, Dr. Manning concluded that "surgery is needed ASAP [sic] surgery deemed urgent as it has been 3 weeks already since the injury – he is to be referred to outside provider for the procedure." *Id*. at 163-164. Dr. Manning again memorialized this urgent recommendation in

---

21-11), the Court will cite to the pertinent record exhibit only once, in the Exhibit filed at ECF No. 19-4.

correspondence which stated that Jenkins "needs ORIF[2] of ankle ASAP." *Id*. at 55 (emphasis in original). The same day, Aryiku completed a consultation request for surgery, citing Dr. Manning's recommendation. *Id*. at 161. On September 17, 2020, Aryiku submitted a similar consultation request for surgery, adding that the surgeon, Dr. Ashok Krishnaswamy, is requesting a consult prior to surgery. *Id*. at 158.

On September 30, 2020, more than one month after the Jenkins was injured, nurse Aryiku conducted a preoperative physical, noting that Jenkins was approved for consultation with the offsite surgeon. ECF No. 19-4 at 152. Aryiku ordered labs and noted "all preop lab results to be faxed in by 10/7/29; scheduler and charge RN aware of this request." *Id*.

On October 2, 2020, Jenkins was transferred to NBCI. At intake, nurse Kimberlie S. Ventura examined Jenkins. ECF No. 19-4 at 150. Jenkins expressed concern about when he will receive surgery on his ankle. *Id*. Ventura referred Jenkins for a sick call related to a medical provider for the surgery "ASAP." *Id*. Dr. Getachew was the named physician provider. *Id*. However, nothing in the records suggests that Jenkins saw Dr. Getachew or any other medical provider for several weeks. Dr. Getachew, however, did order Jenkins' discharge from COVID quarantine on October 16, 2020. *Id*. at 147.

On October 27, 2020, ten weeks after his injury, Jenkins submitted a sick call request that reads, "I put in a sick call last week about my ankle being broken. I would like to know when I would be seen. I keep falling and some nights the pain is unbearable." ECF No. 21-3 at 23. Three days later, Jenkins saw nurse Holly Hoover for the pain. ECF No. 19-4 at 142. Hoover noted that Jenkins has already been seen by orthopedics and that his surgery is pending. *Id*. In the interim,

---

[2] ORIF stands for "open reduction and internal fixation," a surgical procedure used to stabilize and heal a broken bone. https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/ankle-fracture-open-reduction-and-internal-fixation (last visited February 15, 2023).

she prescribed Ultram for his pain and submitted a non-formulary drug request form. *Id*. at 142, 143. She also directed that he should be housed in a cell outfitted with grab bars and assigned the bottom tier bunk for six months. *Id*. at 142.

Nearly two months after Dr. Manning recommended urgent surgery, Jenkins saw orthopedic surgeon, Dr. Krishnaswamy, on October 29, 2020. ECF No. 19-4 at 39. At that visit, Jenkins' ankle was swollen, tender and deformed. *Id*. The ankle also began to heal improperly and so now surgery was required to correct the malunion. *Id*. Six days later, Jenkins saw nurse Hoover again for a pre-operative health and physical examination and blood work. *Id*. at 139 – 141.

Finally, on November 10, 2020, nearly three months after his injury, Jenkins received his surgery. The surgery required "correction of malunion, removal of heterotopic bone formation, open reduction and internal fixation with Biomet locking plate and screws with three syndesmotic screw fixation and repair of the deltoid ligament, right ankle with short-leg splint application." ECF No. 19-4 at 47. Jenkins tolerated the surgery well. *Id*.

Jenkins was monitored at the NBCI infirmary from November 10 through 12, 2020. ECF No. 19-4 at 133-138; ECF No. 21-4 at 1-3. Dr. Getachew continued as Jenkins' health care provider. On November 18, 2020, Jenkins saw William J. Raynor, RN to change his surgical dressing. ECF No. 19-4 at 117. There was no bleeding or signs of infection, and Jenkins was advised to leave the dressing intact. *Id*. Dr. Getachew discharged Jenkins from COVID quarantine on November 12, 2020. ECF No. 19-4at 116.

Although the record is not altogether clear on the sufficiency of the post-operative care that Jenkins received, he appeared to have an unremarkable recovery. Dr. Krishnaswamy wanted to examine Jenkins two weeks after surgery, but this examination did not happen until several months

later. ECF No. 19-4 at 49.  At that visit, Dr. Krishnaswamy observed that surgical wound had healed relatively well and the ankle joint appeared to be in "acceptable alignment" consistent with "early healing." *Id*. at 49-50.  From there, Dr. Krishnaswamy recommended that Jenkins receive twice weekly physical therapy for six to eight weeks and a telemedicine consult with him to determine if Jenkins should receive a short leg walking brace.  *Id*.  Dr. Krishnaswamy also intended to schedule a follow up surgery to remove of screws in the ankle, noting that the screws needed to be removed before Jenkins could put full weight on the ankle without wearing a brace. He also emphasized that the screws must be taken out or they may break.  *Id*. at 49.  Despite this clear directive, Jenkins never saw Dr. Krishnaswamy again.

On February 2, 2021, nurse Hoover examined Jenkins both as follow-up for his ankle and for sharp pain in his chest.  ECF No. 19-4 at 110.  After the exam, Hoover submitted consult requests for physical therapy and orthopedic follow up the same day and noted that Jenkins should continue to change the dressing on his ankle.  *Id*. at 107, 111-112.  The records do not reflect any dressing changes since November 18, 2020.  *Id*. at 117.  The request for follow up orthopedic examination was denied in favor of onsite follow up x-rays.  ECF No. 21-9 at 10.  Dr. Getachew attests that while he did not personally make this recommendation, he had advised Hoover that she should email him if she wanted to appeal it.  *Id*.; ECF No. 21-2 at 4.

On February 25, 2021, physical therapist Stephen D. Ryan examined Jenkins, at which point Jenkins told Ryan that he needed another surgery to remove the screws in his ankle.  ECF No. 19-4 at 106.  Ryan noted that Jenkins was still wearing the post-operative immobilizer and walking shoe, and his leg and ankle were wrapped in ace bandages.  *Id*.  Ryan also noted that while the incisions were healing well, Jenkins had functional weakness in his ankle.  *Id*.  Ryan

5

recommended twelve sessions of physical therapy for ankle strengthening to restore function, increase strength, and establish a self-management program. *Id*.

Jenkins participated in physical therapy with therapist Brenda L. Shaffer on six separate occasions in March 2021. *Id*. at 97, 99, 101-104. For each session, Dr. Getachew is recorded as Jenkins' medical provider. On March 25, 2021, Jenkins saw therapist Ryan again. ECF No. 19-4 at 98. Jenkins told Ryan that his leg and ankle were doing better, but that swelling in the ankle prevent him from wearing a regular sneaker. *Id*. Ryan recommended an additional eight sessions of physical therapy with the goal of decreasing swelling, restoring function of the ankle, walking longer distances without deterioration of gait pattern, and establishing a self-management program. *Id*. However, Jenkins did not receive any further physical therapy.

On May 11, 2021, Jenkins saw another nurse, Alyssa M. Cessna, complaining of pain in his ankle. ECF No. 19-4 at 91. Based on her examination, Cessna referred Jenkins to a physician for evaluation. *Id*. at 93. But nothing in the record reflects that Jenkins ever received that medical evaluation. Again, the record notes Dr. Getachew to be Jenkins' medical provider. *Id*. at 8.

On July 23, 2021, Jenkins submitted a request for sick call in which he complains that he has repeatedly asked for sick calls regarding his ankle with no response. ECF No. 21-6 at 31. He continues, "I'm in pain plus I have a pin that's not suppose[d] to be in there. I was suppose[d] to have another surgery 2 or 3 months ago." ECF No. 21-6 at 31. Three days later, nurse Burnice L. Swan examined Jenkins, noting that his ankle appears healed, but that a "blue string" protrudes from his skin at the incision site. ECF No. 19-4 at 85. Jenkins told Swan that the string is attached to the hardware that needs to be removed. *Id*. Swan, in turn, referred Jenkins for a provider visit and consult placement. *Id*. Again, even though Dr. Getachew is listed as Jenkins' medical provider, no record exists that Jenkins ever saw Dr. Getachew or any other physician. *Id*.

6

On August 8, 2021, nearly nine months after his surgery, Jenkins submitted a sick call request for pain in his ankle. ECF No. 19-4 at 184. He complained that every time he attends a sick call, the nurse refers him for a visit with the provider, but the provider visit is never scheduled. *Id*. Jenkins asked again on August 30, 2021, to see a medical provider for his ankle pain. ECF No. 21-7 at 1.

On September 2, 2021, Jenkins saw another nurse who, once again, referred him for a provider visit. ECF No. 19-4 at 83. Although Dr. Getachew is still listed as Jenkins' "provider," neither he nor any other physician subsequently examined Jenkins. *Id*. Instead, another nurse Janette Clark, examined him. ECF No. 19-4 at 77. Clark knew of Dr. Krishnaswamy's January 14, 2021 recommendation regarding removal of the screws, but notes that the "[f]ollow up request was not approved [sic] recommendations to monitor onsite and reserve follow up for complications. Review of studies regarding removal of syndesmotic screws post op are mixed and do not support necessity." *Id*. She told Jenkins she would provide him literature on ankle and foot conditioning; she also prescribed Celebrex for pain and requested another x-ray and provider visit. *Id*. at 80.

Two days later, the "Corizon Medical Team" informed Jenkins that despite Dr. Krishnaswamy's directive to remove the screws in his ankle, the team determined that "not enough evidence based practice . . . support[s] that removing these screws is necessary." ECF No. 19-4 at 79. Nothing in the record explains the rationale for this decision.

On September 16, 2021, Jenkins filed suit in this Court. ECF No. 1. On September 24, 2021, Jenkins' ankle was x-rayed but he did not see a medical provider. ECF No. 19-4 at 183. On October 7, 2021, Dr. Getachew proscribed Jenkins Celebrex, but shortly after, Jenkins stated in another sick call request that the Celebrex was not helping his pain or swelling. *Id*. at 182. Three

weeks later, physical therapist Brenda L. Shaffer examined Jenkins and noted that he had been discharged from therapy. ECF No. 19-4 at 74. Again, Dr. Getachew is listed as Jenkins' medical provider. *Id*.

On December 17, 2021, Jenkins saw nurse Ernest Massalia for ankle pain. ECF No. 21-9 at 22. Jenkins told Massalia that he was supposed to have screws removed from his ankle, and Massalia observed visible stitches at the surgical site. *Id*. He referred Jenkins to a provider. *Id*. Dr. Getachew was listed as the provider on this record, however nothing indicates that Jenkins saw Dr. Getachew or any other physician. *Id*. at 24. Jenkins followed on with yet another sick call, in which he stated, "I don't know how many sick calls I have to put in about my ankle and the medication I'm on and not being able to see a doctor about my situation." ECF No. 21-9 at 27.

On March 3, 2022, Joginder Mehta, MD examined Jenkins and referred him for removal of the screws. ECF No. 21-9 at 28, 31. Four days later, in connection with this lawsuit, Dr. Getachew signed a sworn declaration, attesting that "[Jenkins] will be evaluated for removal of the syndesmotic screws in his ankle." ECF No. 21-2 at 9.

**II.     Standard of Review**

Defendants move to dismiss the claims under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment to be granted in their favor. Such motions implicate the court's discretion under Rule 12(d). *See Kensington Vol. Fire Dep't., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). To survive a motion to dismiss, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "Threadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). The Court must be able to deduce "more than the mere possibility of misconduct"; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief. *See Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015) (*quoting Iqbal*, 556 U.S. at 679), *aff'd in relevant part*, 659 F. App'x 744 (4th Cir. 2016). Pro se pleadings are given an especially charitable reading so to let all potentially viable claims proceed on the merits. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (*quoting Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). But "even a pro se complaint must be dismissed if it does not allege a 'plausible claim for relief.'" *Forquer v. Schlee*, No. RDB-12-969, 2012 WL 6087491, at *3 (D. Md. Dec. 4, 2012) (*quoting Iqbal*, 556 U.S. at 679).

Rule 12(d) provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The court maintains "'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" *Wells-Bey v. Kopp*, No. ELH-12-2319, 2013 WL 1700927, at *5 (D. Md. Apr. 16, 2013) (quoting 5C Wright & Miller, *Federal Practice & Procedure* § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

Jenkins was placed on notice that Defendants sought summary judgment, and he responded in opposition. ECF Nos. 20, 22. Accordingly, the Court treats the motion regarding the constitutional denial of medical care as one for summary judgment. *See, e.g., Moret v. Harvey*, 381 F. Supp. 2d 458, 464 (D. Md. 2005). Pursuant to Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). Importantly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting Fed. R. Civ. P. 56(e)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249-50.

### III.   Analysis

#### a. Eighth Amendment Denial of Medical Care

The Complaint avers that Defendants Roderick, nurse Beeman, and Dr. Getachew each delayed or denied him constitutionally adequate medical care in violation of the Eighth Amendment's prohibition on "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). For the claim to survive summary judgment, Jenkins must adduce some evidence that each defendant's acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999). "[T]he Constitution is designed to deal with deprivations of

rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson*, 195 F.3d at 695-96; *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (describing the applicable standard as an "exacting"). A mere disagreement between inmate and physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Scinto v. Stansberry*, 841 F.3d at 219, 225 (4th Cir. 2016). Further, the inmate's right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (citing *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)).

Deliberate indifference specifically requires the plaintiff to show that objectively, he was suffering from a serious medical need and that, subjectively, the defendant was aware of the need for medical attention but failed to meet the need either directly or through ensuring that proper care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (internal quotation marks and ellipses omitted).

Additionally, the plaintiff must generate some evidence that defendants exhibited "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said

to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk known to the defendant at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000); *see also Jackson*, 775 F.3d at 179. That said, "negligence or malpractice on the part of. . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Adequacy of treatment in this context "is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir. 1977).

This Court has consistently held that deferral of surgery in favor of conservative treatment alone does not amount to deliberate indifference. *See Dyson v. Wexford Health Sources, Inc.*, No. TDC-19-0307, 2020 WL 1158791, at *7 (Mar. 10, 2020), *aff'd*, 2021 WL 5357490 (4th Cir. 2021); *Rivera v. Wexford Health Sources, Inc.*, No. DKC-17-666, 2018 WL 2431897, at * 4 (May 30, 2018); *Dent v. Wexford Health Sources, Inc.*, No. CBB-15-206, 2017 WL 930126, at *8 (D. Md. 2017), *aff'd sub nom, Dent v. Ottey*, 698 F. App'x 99 (4th Cir. 2017); *Jennings v. Ottey*, No. WMN-14-1736, 2015 WL 4496431, at *5 (July 22, 2015). However, delay of treatment in the face of significant pain is the kind of harm sufficient to support a finding of deliberate indifference. *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 733–34 (4th Cir. 2015); *see Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (collecting cases).

With this standard in mind, the Court turns first to Defendant Roderick.

1. **Defendant Richard Roderick**

Defendant Roderick, Acting Warden at NBCI, argues that no evidence demonstrates that Roderick had any personal involvement in Jenkins' care. ECF No. 19-1. Roderick is correct that Jenkins merely names him in the Complaint, but does not aver or adduce evidence of his personal involvement in Jenkins' medical treatment. ECF No. 1; ECF No. 23 at 3. Rather, Jenkins faults Roderick for dismissing his administrative complaint in which Jenkins challenged the denial of proper medical care. *Id*. at 4. Roderick's involvement in Jenkins' administrative complaint -- even if the complaint concerned the adequacy of the medical treatment Jenkins received -- is not sufficient to sustain the claim. *Whitington v.Ortiz,* 307 F. App'x 179, 193 (10th Cir.2009) (unpublished); *Larson v. Meek,* 240 F. App'x 777, 780 (10th Cir. 2007) (unpublished); *see also Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that warden "rubber stamped" grievances was not enough to establish personal participation) citing *Whitington v.Ortiz,* 307 F. App'x 179, 193 (10th Cir.2009) (unpublished) ("denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations."). Because no facts support that Roderick was involved in Jenkins' course of care, the Court grants summary judgment in his favor.

    **2. Defendants Beeman and Getachew**

Turning next to Defendants Beeman and Getachew, neither defendant disputes that Jenkins suffered from a serious medical need. ECF No. 21-1 at 15. Rather, they concentrate on whether sufficient evidence supports a finding of deliberate indifference in response to those medical needs. Both Dr. Getachew and Beeman argue that each played a limited role in Jenkins' care, and accordingly had little insight into Jenkins' medical needs. Thus, say these providers, without knowledge of the nature and extent of Jenkins' medical needs, neither could be deliberately indifferent to them.

As to nurse Beeman, the Court easily agrees. Beeman appears nowhere in Jenkins medical records as having administered any care to Jenkins. With no evidence that Beeman was at all involved in Jenkins' course of care, the Court must grant summary judgment in his favor.

Dr. Getachew is a different matter. Although Dr. Getachew now vigorously proclaims his lack of involvement in Jenkins' care, the records say otherwise. Indeed, from the moment Jenkins arrived at NBCI needing surgery to repair his severely injured ankle, Dr. Getachew has been Jenkins medical "provider." ECF No. 19-4 at 150, 111-138; 19-4 at 91, 97-104. Nearly every major visit or event related to Jenkins' ankle records Dr. Getachew as the provider. Yet, despite scores of nurse referrals for a "provider" visit, Dr. Getachew never examined Jenkins or arranged for another to do so in his place. This is even after Jenkins put in sick call after sick call, begging for an appointment with a medical provider because he was in pain and needed the surgery screws removed, per Dr. Krishnaswamy's directive. Each time, a nurse would refer Jenkins for such examination, and each time Dr. Getachew ignored him.

Further, the serious delay in removing the ankle screws occurred on Dr. Getachew's watch. Dr. Krishnaswamy made clear that the screws must be removed before Jenkins could put weight on the ankle, and that if not removed, the screws would likely break. Further, Dr. Krishnaswamy intended the screws to be removed two to three months after surgery. Yet for *over fourteen months*, Dr. Getachew did nothing to secure for Jenkins even a consultation regarding this follow up procedure; that is, until this lawsuit. . This is all while Dr. Getachew occasionally proscribed medication for Jenkins and released him from quarantine. When viewing the record most favorably to Jenkins, a reasonable factfinder could conclude that Dr. Getachew knew of, and ignored, Jenkins' serious medical needs with deliberate indifference. Summary judgment is denied as to Dr. Getachew.

b. **ADA Claim**

The Complaint separately refers to violations of the ADA but avers no facts to make the claim plausible. ECF No. 1 at 3. A disability discrimination claim must plausibly aver that (1) the plaintiff suffers from a disability; (2) he was excluded from or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was because of his disability. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502-03 (4th Cir. 2016) (citing *Constantine v. George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)); *Baird ex rel. Baird v. Rose,* 192 F.3d 462, 467 (4th Cir. 1999) (citing *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265). Although the Complaint broadly alleges that Jenkins is "disabled," no other facts explain the nature or extent of his disability. ECF No. 1 at 3. And even if his ankle injury renders him physically disabled, the Complaint focuses solely on Defendants' denial of adequate medical care. This alone is insufficient to establish a violation of the ADA. *See, e.g., Goodman v. Johnson*, 524 F.App'x 887, 890 (4th Cir. 2013) (prison's refusal to provide inmate contact lenses); *Miller v. Hinton,* 288 F.App'x 901, 902-03 (4th Cir. 2008) (prison's denial of access to colostomy bags and catheters for paraplegic inmate did not constitute ADA disability discrimination absent showing that disparate treatment was on account of his disability); *Burger v. Bloomberg,* 418 F.3d 882, 883 (8th Cir. 2005) (substandard medical care provided to inmate for his diabetes insufficient); *Spencer v. Easter,* 109 F.App'x 571, 573 (4th Cir. 2004) (untimely prescription refills alone does not support ADA discrimination claims); *Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir. 1996) (ADA not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners."). Because the ADA claim fails as a matter of law, it must be dismissed.

**IV.    Conclusion**

For the foregoing reasons, Defendant Roderick's Motion to Dismiss, or in the Alternative, for Summary Judgment, is granted.  The Medical Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, is granted in part and denied in part.  The Eighth Amendment claim will proceed against Dr. Getachew.  The Court will appoint pro bono counsel to represent Jenkins.

A separate Order follows.

Date:  3/22/23                                                                             /S/
                                                                                        _____
                                                                                        Paula Xinis
                                                                                        United States District Judge